1

2

3

4

5

6

7

8

9

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

LUCKY BREAK WISHBONE
CORPORATION,

Plaintiff,

v.

SEARS, ROEBUCK AND CO., a New York
corporation, and YOUNG AND RUBICAM
INC., a Delaware corporation,

Defendants.

No.  C06-312Z

ORDER

This matter comes before the Court on the deferred portions of Plaintiff's Combined

Motion for Partial Summary Judgment on Issues of: (1) Originality; (2) Damages; and (3)

Standing and Affirmative Defenses, docket no. 84, and Defendants' Motion for Summary

Judgment, docket no. 87.  After hearing oral argument on October 26, 2007, the Court

GRANTED IN PART, DENIED IN PART, and DEFERRED IN PART Plaintiff's Motion

for Partial Summary Judgment, docket no. 84.  Minutes, docket no. 135.  The Court

GRANTED Plaintiff's summary judgment motion on the issues of standing and fraud,

DENIED on the issue of damages, and DEFERRED on the issue of originality.  The Court

also DENIED IN PART and DEFERRED IN PART Defendants' Motion for Summary

Judgment, docket no. 87.  The Court DENIED Defendants' summary judgment motion on

ORDER  1–

the issue of standing and DEFERRED on the issues of originality and copying and on the issue of whether Defendant Young and Rubicam, Inc. should be dismissed.

The Court now enters the following Order on the deferred portions of the cross-motions for summary judgment regarding Lucky Break Wishbone Corporation's ("Lucky Break") copyright infringement claim based on the Lucky Break Wishbone, as alleged against Defendants Sears, Roebuk and Co. ("Sears") and Young & Rubicam ("Y&R").  See Am. Compl., docket no. 31, ¶¶ 27-28.[1]  For the reasons outlined below, the Court holds the Lucky Break Wishbone was independently created by Mr. Hillesland and contains the minimal degree of creativity required to demonstrate originality.  The design of the Lucky Break Wishbone incorporates sculptural features that can be identified separately from, and are capable of existing independently of, the utilitarian aspects of the article.  Accordingly, the Court GRANTS Plaintiff's motion, and DENIES Defendants' motion, on the issues of originality and utility, and holds that Lucky Break owns a valid copyright in the Lucky Break Wishbone.

On the issue of access, the Court GRANTS IN PART and DENIES IN PART Defendants' summary judgment motion.  The Court GRANTS IN PART Defendants' motion on the issue of access and DISMISSES IN PART Lucky Break's copyright infringement

---

[1] After the parties' cross-motions were filed and fully briefed, Plaintiff filed a Motion for Leave to Amend Complaint, docket no. 121.  On October 26, 2007, the Court heard oral argument and granted Plaintiff's Motion for Leave to Amend Complaint.  Minutes, docket no. 135.  Accordingly, on November 2, 2007, Plaintiff filed its Second Amended Complaint, docket no. 136, alleging two copyright infringement claims.  Plaintiff's first copyright infringement claim in the Second Amended Complaint alleges copying of the Lucky Break wishbone sculpture, see Second Am. Compl. ¶¶ 29-30, and Plaintiff's second copyright infringement claim in the Second Amended Complaint alleges copying of the Lucky Break wishbone product warning, see Second Am. Compl. ¶¶ 31-32.  Although the parties' cross-motions for summary judgment related to the copyright infringement claim in the First Amended Complaint, the first copyright infringement claim alleged in the Second Amended Complaint is identical to the copyright infringement claim alleged in the First Amended Complaint.  As a result, this Order addresses the first copyright infringement claim in the Second Amended Complaint.

ORDER   2–

claim – to the extent Lucky Break alleges that Defendants had access to the *production* wishbone.  The Court DENIES IN PART Defendants' motion and holds that Lucky Break's copyright infringement claim survives summary judgment – to the extent Lucky Break alleges that Defendants had access to the *prototype* wishbone.

On the issue of whether the Sears Wishbone and the wishbone image in the Sears Circular are virtually identical to the Lucky Break Wishbone, the Court STRIKES IN PART and DENIES IN PART Defendants' motion.  The Court STRIKES IN PART the motion as it relates to the Lucky Break production wishbone.  The Court DENIES IN PART the motion as it relates to the Lucky Break prototype wishbone because of genuine issues of material fact.

On the issue of Y&R's infringement, the Court GRANTS Defendants' summary judgment motion and DISMISSES Lucky Break's copyright infringement claim as alleged against Y&R in the Second Amended Complaint, ¶¶ 29-30.

## BACKGROUND
### The Natural Wishbone Model for the Lucky Break Wishbone Sculpture

Lucky Break's founder, Ken Ahroni, conceived of a mass-produced plastic breakable turkey wishbone during Thanksgiving in November 1999, and he kept the wishbone from his Thanksgiving turkey (the "natural wishbone") to use as a model.  Walters Decl., docket no. 86, Ex. H (Ahroni Dep.) at 10:22-24, 12:8-11, 13:10-18; Rachman Resp. Decl., docket no. 101, Ex. 16 (Interrog. No. 4) at 11-12.  In December 2003, Mr. Ahroni took the natural wishbone to Cimtech, Inc. ("Cimtech"), which, in turn, used 3-D design and manufacturing software to collect basic structure data of the natural wishbone for use in manufacturing.  Walters Decl., Ex. H (Ahroni Dep.) at 23:9-11 and Ahroni Dep. Ex. D-1; id., Ex. F (Kidd Dep.) at 8:3-9:18, 11:3-5, 13:1-9, 31:2-8.  Cimtech did not make any decisions of how the plastic wishbone would be molded.  Id., Ex. F (Kidd Dep.) at 13:4-5.

**Lucky Break's Prototype Wishbone**

In December 2003 and January 2004, Dale E. Hillesland of Paraflex, Inc. ("Paraflex") used Cimtech's data to design and create a "prototype" plastic wishbone for Lucky Break. Walters Decl., Ex. H (Ahroni Dep.) at 23:11-18; Rachman Decl., docket no. 92, Ex. 4 (Hillesland Dep.) at 23:4-15, 25:10-20, 26:13-16, 51:19-22; Hillesland Decl., docket no. 108, ¶ 12. Mr. Hillesland spent approximately 65 hours making the prototype mold which was used to make the Lucky Break prototype wishbone. Rachman Decl., Ex. 4 (Hillesland Dep.) at 25:21-25. The prototype mold was completed by January 27, 2004. Id., Ex. 4 (Hillesland Dep.) at 26:4-16.

Mr. Hillesland created the prototype wishbone according to the following process. First, Mr. Hillesland used the Cimtech data to make a computer model of the wishbone. Hillesland Decl. ¶ 4. Because Cimtech provided data for only half of the wishbone, Mr. Hillesland used a software program to create a mirror-image of the other half of the wishbone in the model. Id.; Rachman Decl., Ex. 4 (Hillesland Dep.) at 23:4-9, 29:18-30:6. Second, Mr. Hillesland used the software to select a suitable parting line, which is "the area within a mold block perimeter where the two halves of the mold will separate." Hillesland Decl. ¶ 5. Mr. Hillesland made two alterations to hide the parting line, changes which were made "solely for aesthetic or artistic reasons." Id. Third, Mr. Hillesland used the software to cut electrodes out of graphite. Id. ¶ 6; Rachman Decl., Ex. 4 (Hillesland Dep.) at 32:17-21, 37:14-18. Mr. Hillesland had to choose paths and angles for cutting out the electrodes. Hillesland Decl. ¶ 6. "Electrodes are three dimensional shapes that are cut from graphite using a computer-aided cutting system; they were the first crude likenesses of the wishbone sculpture." Id. Each of the two graphite electrodes represents one half of a wishbone. Rachman Decl., Ex. 4 (Hillesland Dep.) at 33:24-34:4. Fourth, after the electrodes were cut, Mr. Hillesland made many alterations to them manually. Hillesland Decl. ¶ 7; Rachman Decl., Ex. 4 (Hillesland Dep.) at 37:19-21 (referring to "hand-finishing" of the electrodes).

ORDER   4–

1    Fifth, the graphite electrodes were "used as conductors of electricity to burn the mold shapes

2    into metal blocks so the injection molds [could] be created."  Hillesland Decl. ¶ 6.

3          **Lucky Break's Production Wishbone**

4          "Once Lucky Break signed off on the look of the prototype wishbone design, [Mr.

5    Hillesland's] intent was to deliver the same look in the Lucky Break Wishbones that came

6    out of the final production molds."  Hillesland Decl. ¶ 12.  Mr. Hillesland started working on

7    the final production mold in June 2005, and completed work on it by the end of September

8    2005.  Rachman Decl., Ex. 4 (Hillesland Dep.) at 51:23-52:19.  In making the production

9    mold, Mr. Hillesland used the same data set and "the same cutter paths for the electrodes" as

10   he used for the prototype mold.  Id., Ex. 4 (Hillesland Dep.) at 41:24-42:4; Hillesland Decl.

11   ¶ 12.  He created two new graphite electrodes for the production mold, separate from the

12   graphite electrodes for the prototype mold.  Rachman Decl., Ex. 4 (Hillesland Dep.) at 35:1-

13   10, 37:3-7.  The graphite electrodes for the production mold have been submitted into the

14   record on summary judgment.  Id., Ex. 4 (Hillesland Dep.) at 32:17-21, 33:24-34:4

15   (describing D-42 and D-43 Exhibits to the Hillesland Dep.).

16         **Mr. Hillesland's Hand-Finishing of the Graphite Electrodes**

17         As noted above, Mr. Hillesland "hand-finished" the graphite electrodes to make the

18   molds for the wishbones, and he used the same data set and the same cutter paths to make

19   graphite electrodes for the production mold as for the prototype mold.  Specifically, Mr.

20   Hillesland testified with respect to the hand-finishing on the *prototype* graphite electrodes:

21
       Q:    Do you remember what you did?
22
       A:    Basically the same things as I did on the other one [i.e., the production
23           graphite electrodes].  I round out the end a little bit.  I reduce some of
             this area in the center of the electrode, and on the two tips out there, I,
24           on one side of it, I did some sanding to reduce the shape on that where it
             was kind of bulging out a little bit.  I went in and gave it a little file with
25           some sandpaper.  Any real sharp edges on there, I don't remember how
             many I did at the time, but I go in and I knock down the little things . . .
26

ORDER  5–

Rachman Decl., Ex. 4 (Hillesland Dep.) at 37:22-38:7.  With respect to the hand-finishing on the *production* graphite electrodes, Mr. Hillesland testified that he made "five to six" changes from the natural wishbone, including rounding out the head, reducing some area in the center to knock down a high spot, smoothing the outside edges, sanding the ends of the arms, thinning the arm, and breaking the edge.  Id., Ex. 4 (Hillesland Dep.) at 43:3-48:7.

After describing the five to six changes he made to the production graphite electrodes, he testified that he did the same hand-finishing on the prototype graphite electrodes, but he also admitted there could be some variations in what he did:

Q:    Do you think you did the same things to the prototype?

A:    Yes.

Q:    But there could be variations between the –

A:    Right.

Q:    Let me finish the question.  There could be variations to the extent of what you did on the prototype versus what you did on the production mold?

A:    Yes.

Id., Ex. 4 (Hillesland Dep.) at 48:11-19.

He also admitted that he could not remember whether he had the prototype mold in front of him when he made the production mold, and that there could be some resulting differences between the prototype and production molds:

Q:    And then the changes that were made after – from the data set you did by hand?

A:    Yes.

Q:    So how did you – did you have the prototype mold in front of you when you made the changes to the graphite on the production mold?

A:    I don't remember.

Q:    So do you know whether the hand changes you made on the production mold are the same as the ones you made on the prototype mold?

ORDER   6–

A:     I don't know.

Q:     So there could be some differences between what you changed on the graphite electrodes for the prototype versus the graphite electrodes –

A:     There could be.

Q:     Okay.  And how would that – would that show up in any way?

A:     (No response.)

Q:     Would it change the thickness, or would it change the appearance?

A:     It may change some – there would be really, really subtle changes in it, as far as maybe the thickness on it.

Rachman Decl., Ex. 4 (Hillesland Dep.) at 42:5-43:2.

In his subsequent declaration, Mr. Hillesland states more equivocally: "I made the same manual alterations to the electrodes" for the production mold as for the prototype mold. Hillesland Decl. ¶ 12.  He further explains:

> After nearly thirty years in the business, I am capable of filing and sanding electrodes to create the precise image I want.  For this reason, I was able to ensure that the final Lucky Break Wishbones were effectively identical to the prototype Lucky Break Wishbones.  The only meaningful difference in the appearance of the prototype and production Lucky Break Wishbones resulted from a slight adjustment in the height of the ejector pins, which made the ejector pins raised on the prototype Wishbones and recessed on the production Wishbones.  To my mind, the prototype and production Lucky Break Wishbones are the same wishbone sculpture.

Id.  In addition to the difference in the ejector pins, Mr. Hillesland also testified in his deposition that there is a "slight variation" in the parting line between the prototype and production molds, and that this change reduced the thickness of the width of the production wishbone as compared to the prototype wishbone.  Rachman Decl., Ex. 4 (Hillesland Dep.) at 40:4-41:11, 49:8-10, 50:12-51:18.  Mr. Ahroni testified in his deposition that the prototype and production wishbones have "a slight difference in the inside of the V where the gating of the wishbone is."  Id., Ex. 2 (Ahroni Dep.) at 85:11-21.

ORDER  7–

1        **Artistic Intent**

2            Mr. Hillesland stated in his declaration that he "spent at least fifteen to twenty hours

3    shaping the electrodes so the molds would create nice-looking plastic wishbones."

4    Hillesland Decl. ¶ 7.  "[T]he manual alterations I made were to avoid sharp edges" and "to

5    create a smoother surface."  Id.  The graphite electrodes were sanded and rounded to obtain

6    the desired shape, smoothness and look.  Rachman Decl., Ex. 4 (Hillesland Dep.) at 32:17-

7    33:20, 37:14-21.  Although some of Mr. Hillesland's manual changes to the graphite

8    electrodes were for handling purposes (i.e., to make the wishbone smooth), other changes

9    were for aesthetic reasons.  Id., Ex. 4 (Hillesland Dep.) at 44:3-16 (smoothing bump because

10   he "didn't like the way it looked," and not because it had any effect on making it an easier

11   mold to use or less expensive), at 46:2-4 (smoothing end because he "didn't want it too blunt

12   looking"), and at 46:12-13 (he "want[ed] the thing to look a certain way").  Mr. Hillesland

13   testified that his hand-work was intended to "creat[e] a caricature of what I think a wishbone

14   . . . looks like," and that he didn't "really care at that point what [the natural wishbone]

15   look[ed] like anymore."  Id., Ex. 4 (Hillesland Dep.) at 46:19-24.  When asked why he

16   rounded the head, he testified "[a]gain, cosmetics mostly."  Id., Ex. 4 (Hillesland Dep.) at

17   47:4-7.  Mr. Hillesland stated in his declaration that "an infinite number of design options

18   concerning the specific shaping and contours of the Lucky Break Wishbone were available to

19   me within the general confines of manufacturing within plastic, so I was free to give the

20   Lucky Break Wishbone the artistic look I wanted to achieve."  Hillesland Decl. ¶ 9.  Mr.

21   Hillesland made changes because he "was concerned with the aesthetic appearance of the

22   final wishbone" and he wanted to achieve "a sleek, smooth, stylized wishbone sculpture."

23   Id. ¶¶ 7, 8.  He "spent significant effort to achieve that look at all stages of the molding

24   process."  Id. ¶ 8.

25

26

ORDER   8–

1    **Expert Testimony Regarding Differences Between Lucky Break's Production**

2    **Wishbone and the Natural Wishbone**

3    Lucky Break's expert on plastics engineering, Axel Sommer, has identified eleven

4    features that distinguish Lucky Break's production wishbone from the natural wishbone.

5    Rachman Decl., Ex. 32 (Mr. Sommer's Expert Report) at 7-11.  Lucky Break's expert in

6    avian anatomy, Dr. David Steadman, has identified seven features of the production

7    wishbone "that are of distinctly human origin or design."  Steadman Decl., docket no. 63,

8    Ex. A (Dr. Steadman's Expert Report), at 5-7.  Dr. Steadman states that these features "are

9    not 'standard' elements of [] furcula[2] nor are they 'indispensable' to the realistic expression

10   of [] furcula."  Id., Ex. A, at 7.

11   **Copyright Registration**

12   Lucky Break registered the "Lucky Break Wishbone" sculpture with the United States

13   Copyright Office as Reg. No. VA 1-325-348 ("the '348 Registration").  Rachman Decl., Ex.

14   26 (Certificate of Registration); Ahroni Decl., docket no. 66, ¶¶ 2, 3, Ex. A (Lucky Break's

15   application and deposit materials).  Lucky Break represented on its application for copyright

16   registration that "2004" was the "Year in Which Creation of This Work Was Completed,"

17   see Ahroni Decl., Ex. A, which was the year that the prototype wishbone was completed, and

18   not the year the production wishbone was completed.

19   Defendants contend that Lucky Break only deposited a photocopy[3] of Lucky Break's

20   production wishbone, and not Lucky Break's prototype wishbone, with the U.S. Copyright

21   Office in connection with the application for copyright registration.  Defs.' Mot., docket no.

22

---

23   [2] Dr. Steadman does not define furcula.  The dictionary defines "furcula" as the plural form
24   of "furculum," which is synonymous with "wishbone."  Webster's Third New International
     Dictionary at 923 (1981).

25

26   [3] For sculptural works, the U.S. Copyright Office instructs copyright registrants to provide
     two-dimensional "identifying material" and does not accept physical samples.  Walters
     Decl., Ex. L. at 2.

ORDER   9–

87, at 11 (citing Rachman Decl., docket no. 92, Ex. 2 (Ahroni Dep.) at 101:3-102:23 and Exs. 27, 30 and 42).  Contrary to Defendants' assertion, the evidence is not "clear" that Lucky Break's deposit was a copy of the production wishbone.  The first piece of evidence relied upon is Mr. Ahroni's deposition.  Defendants argue that Mr. Ahroni "admitted" that Lucky Break registered the production wishbone; however, a close look at Mr. Ahroni's deposition reveals no such "admission."  In the excerpt relied upon by Defendants, Mr. Ahroni merely states that any wishbones created in December 2005 – i.e., at the time Lucky Break applied for copyright registration – would have been made from the production mold, and not the prototype mold.  There is no follow-up testimony, however, that the deposit was a copy of a wishbone created in December 2005.  Mr. Ahroni "can't tell" whether the wishbone in Exhibit D-12 was created with the prototype mold or the production mold, but he "assumes" it was made from the production mold.  Rachman Decl., Ex. 2 (Ahroni Dep.) at 102:15-23; Walters Decl., Ex. H, at 137 (Ex. D-12).  The second piece of evidence relied upon by Defendants is Exhibit 27 to the Rachman Declaration, which is a copy of Plaintiff's deposit showing three wishbone images, and is labeled Hillesland Deposition Exhibit D-45. Rachman Decl. ¶ 28.  Mr. Hillesland testified about Exhibit D-45 as follows:

> Q: Looking at these images on D-45, can you tell whether these are images of a wishbone from a production mold versus the prototype mold?
>
> A: (No response.)
>
> Q: I can focus your attention on the first, the left-hand image where you see the ejector pin markings.
>
> A: My best feeling would be it's the production mold.  I'll go with that.
>
> Q: And what are you basing that on?
>
> A: Maybe the ejector pins.  Maybe the lines, where the parting line is, too. Yeah.

Id., Ex. 4 (Hillesland Dep.) at 72:23-73:9.  The third and fourth pieces of evidence relied upon by Defendants are Exhibits 30 and 42 to the Rachman Declaration, which are pictures

ORDER  10–

1   of the production wishbones and prototype wishbones, respectively.  Despite any

2   deficiencies in this evidence, Lucky Break has not contested the fact that the deposit was a

3   copy of the production wishbone.  This issue may be important to the Court's jurisdiction

4   over Lucky Break's copyright infringement claim, as discussed in this Order at Footnote 10.

5

6       **The Sears "Wish Big" Promotion**

7       Y&R, an advertising agency, conceived of a wishbone giveaway and coupon

8   bounceback offer and introduced the idea to its client, Sears.  Answer, docket no. 33, ¶ 13;

9   Rachman Decl., Ex. 7 (Katz Dep.) at 42:18-21.  When Y&R commenced negotiations with

10  Lucky Break over the possible purchase of Lucky Break's wishbones, Lucky Break's

11  President, Mr. Ahroni, was aware that Y&R was acting on behalf of Sears.  Rachman Decl.,

12  Ex. 2 (Ahroni Dep.) at 189:16-190:8.  Lucky Break provided fifty wishbones to Y&R on

13  June 20, 2005, and two blue wishbones to Y&R on July 21, 2005.  Id., Ex. 2 (Ahroni Dep.)

14  at 80:10-24, 168:9-23, Ex. 6 (Navratil Dep.) at 52:23-53:18, Ex. 21 (Invoice to Y&R dated

15  June 20, 2005).  Given this timing, the parties do not dispute that Lucky Break provided

16  Y&R with prototype wishbones, not production wishbones.  Between July 5, 2005 and July

17  19, 2005, Y&R and Mr. Ahroni discussed the terms of a possible purchase of 1 to 2 million

18  Lucky Break wishbones.  Id., Ex. 20 (July 2005 emails between Y&R and Mr. Ahroni).

19  Y&R passed along Lucky Break's price estimate to Sears.  Id., Ex. 6 (Navratil Dep.) at 60:4-

20  6.  In June or July 2005, Y&R presented physical samples of the Lucky Break prototype

21  wishbones to Sears.  Id., Ex. 6 (Navratil Dep.) at 62:9-12, 63:19-24, Ex. 7 (Katz Dep.) at

22  92:9-93:20.  Lucky Break authorized Y&R's distribution of the sample wishbones and other

23  Lucky Break materials to Sears.  Id., Ex. 2 (Ahroni Dep.) at 163:5-16.  Y&R recommended

24  that Sears use Lucky Break to provide wishbones for the promotion.  Id., Ex. 6 (Navratil

25  Dep.) at 67:12-16.  At a date uncertain, Y&R became aware that Sears did not purchase

26

ORDER   11–

1   wishbones from Lucky Break, but, even then, Y&R did not know the identity of the other

2   vendor.  Id., Ex. 6 (Navratil Dep.) at 72:23-73:16.

3       In or about late July 2005, Sears engaged Apex Products ("Apex"), an Illinois-based

4   trading company (not a party to this action), to procure the overseas manufacture of plastic

5   wishbones for Sears (the "Sears Wishbone") in lieu of the Lucky Break wishbones.  Id., Ex.

6   8 (Chiou Dep.) at 14:2-10, 16:6-17:7, 19:1-8, 25:15-27:14.  Sears provided a Lucky Break

7   wishbone to Apex sometime in early- or mid-August.  Id., Ex. 8 (Chiou Dep.) at 37:18-38:2,

8   39:18-40:1.  Apex communicated with a manufacturer in China regarding the wishbone

9   project.  Id., Ex. 8 (Chiou Dep.) at 41:11-14.  Mr. Chiou of Apex testified that the Chinese

10  manufacturer used a real turkey wishbone upon which to base its original price estimate, and

11  used the Lucky Break wishbone only as a "size reference."  Id., Ex. 8 (Chiou Dep.) at 26:14-

12  18, 38:23-39:17, 105:4-7.

13      In or about June or July 2005, the ABD Group ("ABD"), another advertising agency

14  (also not a party to this action), began creating an advertisement for Sears (the "Sears

15  Circular"), for use in connection with a pre-Thanksgiving in-store promotional event that

16  was part of the Sears "Wish Big" holiday campaign.  Id., Ex. 7 (Katz Dep.) at 50:18-24, Ex.

17  22 (ABD "Conference Report" dated July 12, 2005), Ex. 23 (Sears Circular showing a

18  wishbone in upper left corner on the first page).  Sears provided a wishbone to ABD to be

19  photographed for use in the Sears Circular, but Sears's Ms. Katz did not know whether it

20  was a Lucky Break wishbone or a wishbone provided by the Chinese manufacturer used by

21  Apex; she assumed it was a manufacturer's production sample provided by Apex.  Id., Ex. 7

22  (Katz Dep.) at 58:23–59:2, 60:2-24, 67:1-68:10, 69:2-70:5.  Based on similar features, Mr.

23  Ahroni asserts that Lucky Break's prototype wishbone was used to make the wishbone image

24  in the Sears Circular.  Id., Ex. 2 (Ahroni Dep.) at 151:7-153:4.

25      Sears distributed the Sears Wishbones in Sears stores on November 19, 2005, to

26  customers making purchases on that date, while supplies lasted.  Id., Ex. 7 (Katz Dep.) at

ORDER  12–

139:3-18; Ex. 23 (Sears Circular dated Nov. 19, 2005, stating: "Today Only, With Any Purchase, Get Your Wishbone and Get $10 Off Your Next Purchase").  The cardboard topper that accompanied the Sears Wishbone included a coupon with which the customer could return between November 20, 2005 and November 23, 2005, and receive $10 off a purchase of $100 or more.  Id., Ex. 24 (showing cardboard topper, atop the bag containing the Sears Wishbone).  Y&R created the cardboard topper.  Id., Ex. 6 (Navratil Dep.) at 71:5-72:9, Ex. 7 (Katz Dep.) at 42:22-43:6.

## DISCUSSION

### A.    Summary Judgment Standard

Summary judgment is appropriate when the movant demonstrates that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(c); Addisu v. Fred Meyer, Inc., 198 F.3d 1130, 1134 (9th Cir. 2000).

### B.    Copyright Infringement

"To establish [copyright] infringement, two elements must be proven: (1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., 499 U.S. 340, 361 (1991).

#### 1.    First Element of Copyright Infringement: Ownership of a Valid Copyright

Under the Copyright Act, a plaintiff cannot maintain an infringement action until it has registered its work with the Copyright Office.  17 U.S.C. § 411(a) ("no action for infringement of the copyright in any United States work shall be instituted until preregistration[4] or registration of the copyright claim has been made in accordance with this title"); Invision Media Servs., Inc. v. Glen J. Lerner, 175 Fed.Appx. 904, 907 (9th Cir. Apr. 13, 2006) (17 U.S.C. § 411(a) is a "jurisdictional prerequisite").  "In order to obtain a copyright registration, an applicant must deposit as part of his application a 'copy' or

---

[4] Preregistration does not apply here.  See 37 C.F.R. § 202.16.

'copies' of the work, 17 U.S.C. § 408(b)(1) and (2)," and the Ninth Circuit has interpreted copies of the work to mean "bona fide copies of the original work," and not "reconstructions." Kodadek v. MTV Networks, Inc., 152 F.3d 1209, 1211 (9th Cir. 1998). Although "[c]opyright registration is not a prerequisite to a valid copyright," Kodadek, 152 F.3d at 1211,[5] registration "is considered prima facie evidence of the validity of the copyright, which can be challenged by presenting evidence attacking the elements of a valid copyright, such as ownership, copyrightable subject matter, and originality." Syntek Semiconductor Co. v. Microchip Tech. Inc., 307 F.3d 775, 781 (9th Cir. 2002); see also 17 U.S.C. § 410(c). A certificate of copyright registration, therefore, "shifts to the defendant the burden to prove the invalidity of the plaintiff's copyrights." Entm't Research Group, Inc. v. Genesis Creative Group, Inc., 122 F.3d 1211, 1217 (9th Cir. 1997). "An accused infringer can rebut this presumption of validity, however." Id. "To rebut the presumption, an infringement defendant must simply offer some evidence or proof to dispute or deny the plaintiff's prima facie case of infringement." Id.

The Court accepts as true the undisputed fact that the deposit submitted with Lucky Break's application for copyright registration was a copy of the production wishbone, and not the prototype wishbone. Thus, Lucky Break's '348 Registration is prima facie evidence of the validity of Lucky Break's copyright in the production wishbone, but is not prima facie evidence of the validity of Lucky Break's copyright in the prototype wishbone. As the Court discusses below in connection with the issue of "access," Lucky Break must prove that it has a valid copyright, and a valid copyright registration, in the *prototype* wishbone in order to succeed on its copyright infringement claim because Defendants had access only to the prototype wishbone. Because there is a question – that has yet to be addressed by the parties – as to whether Lucky Break has a valid copyright registration in the prototype wishbone, there is no presumption of validity of Lucky Break's copyright in the prototype wishbone as

---

[5] See also 17 U.S.C. § 408(a) ("[R]egistration is not a condition of copyright protection").

ORDER 14–

a result of the '348 Registration.  The parties have cross-moved for summary judgment on two related issues[6] addressing the validity of Lucky Break's copyright – originality and utility.[7]

### a.   Validity (Originality) – Cross-Motions for Summary Judgment

The Copyright Act protects "*original works of authorship* fixed in any tangible medium of expression, now known or later developed, from which they can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device."  17 U.S.C. § 102(a) (emphasis added).  Thus, "[c]opyright protection subsists from the moment the work is 'fixed in any tangible medium of expression.'"  S.O.S., Inc. v. Payday, Inc., 886 F.2d 1081, 1085 (9th Cir. 1989) (quoting 17 U.S.C. § 102(a)).  The Copyright Act does not extend protection "to any idea, procedure, process, system, method of operation, concept, principle, or discovery, regardless of the form in which it is described, explained, illustrated, or embodied in such work."  17 U.S.C. § 102(b).  Thus, Section 102(b) "makes only expression, not ideas, eligible for copyright protection."  Eldred v. Ashcroft, 537 U.S. 186, 219 (2003).  "[F]acts are not copyrightable" because "[t]he *sine qua non* of copyright is originality."  Feist, 499 U.S. at 345.  "Original, as the term is used in copyright, means only that the work was independently created by the author (as opposed to copied from other works), and that it possesses at least some minimal degree of creativity."  Id.  In

---

[6] Defendants challenged Lucky Break's ownership of the copyright through their argument that Lucky Break lacked standing to sue for copyright infringement.  After hearing oral argument, the Court held that Lucky Break owned the Lucky Break Wishbone copyright at the time of the alleged infringement in November 2005, and thus had standing to sue, based on a December 22, 2005 written memorialization of a January 2004 oral agreement to transfer all intellectual property rights from Paraflex to Lucky Break.  Thus, the ownership issue is no longer before the Court.

[7] Defendants combine their originality and utility arguments, but they are appropriately dealt with as separate challenges to the validity of Lucky Break's copyright.  See Superior Form Builders, Inc. v. Dan Chase Taxidermy Supply Co., 74 F.3d 488, 494 (4th Cir. 1996) (noting that utility focuses on whether a sculptural work is a "useful article" within the meaning of 17 U.S.C. § 101).

ORDER   15–

1   <u>Feist</u>, the Supreme Court found originality lacking in the alphabetical arrangement of a

2   telephone directory because alphabetical arrangement was "entirely typical" and the

3   directory was "devoid of even the slightest trace of creativity." <u>Feist</u>, 499 U.S. at 362.

### i.   Independent Creation

5   "Originality . . . means little more than a prohibition against actual copying." <u>North</u>

6   <u>Coast Indus. v. Jason Maxwell, Inc.</u>, 972 F.2d 1031, 1033 (9th Cir. 1992) (citation and

7   quotation omitted). "No matter how poor artistically the author's addition, it is enough if it

8   be his own." <u>Id.</u> Defendants assert that Lucky Break's copyright "is no more than a plastic

9   reproduction of a naturally occurring item – a turkey wishbone." Defs.' Mot at 14 (citing

10  Rachman Decl., Exs. 30, 41, 42 (photos of natural wishbone and of Lucky Break's prototype

11  and production wishbones)). These photos do not demonstrate that the Lucky Break

12  Wishbone[8] is an exact copy of a natural wishbone. While it is undisputed that a natural

13  wishbone was used to provide the data set for the creation of the Lucky Break Wishbone, the

14  use of "a matter in the public domain" upon which to base one's work does not preclude

15  originality. <u>See</u>, <u>e.g.</u>, <u>Kamar Int'l, Inc. v. Russ Berrie and Co.</u>, 657 F.2d 1059, 1061 (9th Cir.

16  1981). In <u>Kamar</u>, the Ninth Circuit reversed summary judgment that toy animals lacked

17  originality, reasoning that "[t]he mere fact that plaintiff used a matter in the public domain

18  does not in and of itself preclude a finding of originality, since plaintiff may have added

19  unique features to the matter so as to render it copyrightable." <u>Id.</u> (citation omitted).

20      Paraflex's Mr. Hillesland made artistic changes to the data set when making the

21  computer model, and he subsequently made changes to the graphite electrodes used to create

22  the Lucky Break Wishbone. <u>See</u>, <u>e.g.</u>, Hillesland Decl. ¶¶ 5-7; Rachman Decl., Ex. 4

23  (Hillesland Dep.) at 37-38, 43-48. Defendants do not challenge Mr. Hillesland's testimony

24  _____

25  [8] For the purposes of this discussion of originality and utility, the term "Lucky Break
    Wishbone" refers to both the prototype wishbone and the production wishbone. Thus, the
26  Court's conclusions with respect to originality and utility apply to both the prototype and
    production wishbones.

ORDER   16–

1  that he made changes to the data set to create the computer model, and they admit that Mr.

2  Hillesland made changes to the graphite electrodes used to create the injection mold for the

3  Lucky Break Wishbone.  Defs.' Mot. at 16; Defs.' Opp'n at 9.  Defendants argue that Mr.

4  Hillesland's changes were so trivial that even he could not determine whether printouts of

5  visual images of a wishbone represented the wishbone before he made the changes or

6  afterward.  Rachman Decl., Ex. 4 (Hillesland Dep.) at 66:21-23, 67:11-68:8, 71:9-17, Exs.

7  13, 14.  Mr. Hillesland's testimony does not prove that his changes were trivial.  Indeed, Mr.

8  Hillesland's manual alterations to the electrodes consumed fifteen to twenty hours of his

9  time, and his testimony regarding the hand-finishing of the electrodes shows that he

10  expended significant effort to create a wishbone sculpture independent of the natural

11  wishbone.  Plaintiff has met its burden to show independent creation.

12  **ii.   <u>Minimal Creativity</u>**

13       An original work must not only be independently created, but it also must "possess[]

14  at least some minimal degree of creativity."  <u>Feist</u>, 499 U.S. at 345.  The <u>Feist</u> Court

15  addressed "the requisite level of creativity," as follows:

16
17       [T]he requisite level of creativity is extremely low; even a slight amount will
         suffice. The vast majority of works make the grade quite easily, as they possess
18       *some creative spark*, no matter how crude, humble or obvious it might be.
         Originality does not signify novelty; a work may be original even though it
19       closely resembles other works so long as the similarity is fortuitous, not the
         result of copying.

20  <u>Feist</u>, 499 U.S. at 345 (internal citations and quotations omitted) (emphasis added).  The

21  <u>Feist</u> Court emphasized, however, that although "[t]he standard of originality is low, . . . it

22  does exist."  <u>Id.</u> at 362.  "[A]n author who claims infringement must prove the existence of

23  intellectual production, of thought, and conception."  <u>Id.</u> (internal quotation and citation

24  omitted).

25       Defendants argue that Lucky Break has offered contradictory arguments identifying

26  the unique features of the Lucky Break Wishbone.  Defendants point out that in Lucky

ORDER   17–

1   Break's initial responses to Defendants' Interrogatories, Lucky Break identified six allegedly

2   original or creative elements in its wishbone.  Rachman Resp. Decl., Ex. 16, at Interrog. No.

3   4 (describing Mr. Hillesland's artistic decisions), Interrog. No. 6 (six categories of "stylized

4   accents"), and Interrog. No. 7 (referring back to Interrog. Nos. 4 and 6 in response to request

5   to describe all "original or creative elements"); see also Ex. 4 (Hillesland Dep.) at 37:22-

6   38:11, 43:3-48:7 (describing "five to six" changes).  At the close of discovery, Lucky Break

7   supplemented its responses to interrogatories with reports of two experts, each of whom

8   assert between seven and eleven distinguishing features.  Rachman Resp. Decl., Ex. 17

9   (Interrog. Nos. 4, 6, and 7); Rachman Decl., Ex. 32 (Mr. Sommer's Expert Report) at 7-11;

10  Steadman Decl., Ex. A (Dr. Steadman's Expert Report) at 5-7.  Regardless of the number, or

11  identification, of original or creative elements, there are creative elements in the Lucky Break

12  Wishbone as a result of Mr. Hillesland's manual alterations to the graphite electrodes.  The

13  evidence demonstrates that Lucky Break has met the "extremely low" standard for "minimal

14  creativity."  See Feist, 499 U.S. at 345.  There is no requirement that "for valid copyright

15  protection, the copyright must represent something entirely new under the sun."  North Coast

16  Indus., 972 F.2d at 1033.  Plaintiff has met its burden to show the "minimal creativity"

17  required for originality.

18              **b.    Validity (Utility) – Cross-Motions for Summary Judgment**

19        As noted above, the Copyright Act protects "original works of authorship."  17 U.S.C.

20  § 102(a).  "Works of authorship include . . . sculptural works."  Id.  "'[S]culptural works'

21  include . . . three-dimensional works of fine, graphic, and applied art."  Id. § 101(a).

22  However, utilitarian aspects of sculptural works are not copyrightable:

23
24        Such works shall include works of artistic craftsmanship insofar as their form
          but not their mechanical or utilitarian aspects are concerned; the design of a
          useful article . . . shall be considered a . . . sculptural work only if, and only to
25        the extent that, such design incorporates . . . sculptural features that can be
          identified separately from, and are capable of existing independently of, the
26        utilitarian aspects of the article.

ORDER   18–

1   Id.  The Ninth Circuit has recognized that animal mannequins painted, fitted with artificial

2   eyes, and covered with flocking are copyrightable.  Rachel v. Banana Republic, Inc., 831

3   F.2d 1503, 1507 (9th Cir. 1987).  "Where design elements can be identified as reflecting the

4   designer's artistic judgment exercised independently of functional influences, conceptual

5   separability exists."  Brandir Int'l, Inc. v. Cascade Pac. Lumber Co., 834 F.2d 1142, 1145

6   (2d Cir. 1987); see also Kieselstein-Cord v. Accessories by Pearl, Inc., 632 F.2d 989, 993

7   (2d Cir. 1980) (finding sculptural element of belt buckle conceptually separable from

8   utilitarian function).

9        Defendants argue that Mr. Hillesland made changes to the graphite electrodes for

10  utilitarian purposes.  Defendants selectively refer to the evidence to argue that Mr.

11  Hillesland's changes were intended to make the Lucky Break Wishbone easier to handle or

12  to break.  Although there is evidence that some changes may have, in fact, been made for

13  utilitarian reasons, the evidence is undisputed that other changes were made solely for

14  aesthetic or artistic reasons.  See, e.g., Rachman Resp. Decl., Ex. 16 (Interrog. No. 4)

15  (describing Mr. Hillesland's "artistic decisions"); Hillesland Decl. ¶ 5 ("I made these

16  changes [to the computer model] solely for aesthetic or artistic reasons"); id. ¶ 6 ("I made

17  choices . . . to make the final wishbone look better – sleeker and more attractive"); id. ¶ 7

18  ("My hand-working of the electrodes was always done with an eye towards shaping and

19  sculpting the part to fit my image of 'the perfect wishbone'"); id. ("Most of the differences

20  between the original natural wishbone model and the Lucky Break Wishbone were both

21  deliberate and intended to make the Lucky Break Wishbone more appealing aesthetically.").

22  Mr. Hillesland stated in his declaration that "none of the features discussed by Mr. Sommer

23  was required by the manufacturing process," that "none was designed solely to serve a

24  practical or useful result," and that "some features, such as the ridge, the valleys, and the

25  arrowhead shaped joint, were design[ed] solely for aesthetic reasons."  Id. ¶ 10.  Mr.

26  Hillesland testified in his deposition that several design features – such as sanding down a

ORDER   19–

1   high spot at the bottom of the head and rounding the head – were made to achieve an

2   aesthetic result independent of any functional or manufacturing limitation.  See, e.g., Walters

3   Resp. Decl., docket no. 106, Ex. E (Hillesland Dep.) at 43:17-24, 47:3-15.  Plaintiff has met

4   its burden to show that some of the features of the Lucky Break Wishbone were made solely

5   for aesthetic or artistic reasons, independent of any utilitarian aspect.

6   **c.**   **Conclusion Re: Validity Issues of Originality and Utility**

7       The Lucky Break Wishbone was independently created by Mr. Hillesland and

8   contains the minimal degree of creativity required to demonstrate originality.  The design of

9   the Lucky Break Wishbone incorporates sculptural features that can be identified separately

10  from, and are capable of existing independently of, the utilitarian aspects of the article.

11  Accordingly, the Court GRANTS Plaintiff's summary judgment motion, and DENIES

12  Defendants' summary judgment motion, on the issues of originality and utility, and holds

13  that Lucky Break owns a valid copyright[9] in the Lucky Break Wishbone.  In other words,

14  both the prototype wishbone and production wishbone are "original works of authorship

15  fixed in any tangible medium of expression."  See 17 U.S.C. § 102(a).

16  **2.**   **Second Element of Copyright Infringement: Copying of Original Elements**

17      The second element of copyright infringement is "copying of constituent elements of

18  the work that are original."  Feist, 499 U.S. at 361.  "Because direct evidence of copying is

19  rarely available, a plaintiff may establish copying by circumstantial evidence of: (1)

20  defendant's access to the copyrighted work prior to the creation of defendant's work, and (2)

21  substantial similarity of both general ideas and expression between the copyrighted work and

22  the defendant's work."  Baxter v. MCA, Inc., 812 F.2d 421, 423 (9th Cir. 1987); see also

23  Jada Toys, Inc. v. Mattel, Inc., 496 F.3d 974, 983 (9th Cir. 2007) ("[c]opying can be proved

24  by evidence indicating that the infringer had access to the copyrighted work and that the

25

_____

26  [9] Again, the Court emphasizes that a valid copyright is different from a valid copyright registration.

ORDER   20–

1   protected portions of the works are substantially similar.").  Defendants have moved for

2   summary judgment on the issues of access and substantial similarity.

3                    **a.      <u>Copying (Access) – Defendants' Motion for Summary Judgment</u>**

4          As noted above, to prove copyright infringement, a copyright owner must demonstrate

5   "defendant's access to *the copyrighted work* prior to the creation of defendant's work."

6   <u>Baxter v. MCA, Inc.</u>, 812 F.2d at 423 (emphasis added).  "Proof of access requires an

7   opportunity to view or to copy plaintiff's work."  <u>Three Boys Music Corp. v. Bolton</u>, 212

8   F.3d 477, 482 (9th Cir. 2000) (citation and internal quotation omitted).  "Direct access" is

9   shown if there is "proof that defendant actually viewed, read, or heard the work at issue."  3

10  William F. Patry, <u>Patry on Copyright</u>, § 9:24, at 9-55 (2007).  "[A] prior-created work cannot

11  infringe a later-created one" because there can be no access to the copyrighted work.

12  <u>Christian v. Mattel, Inc.</u>, 286 F.3d 1118, 1128 (9th Cir. 2002) ("By simple logic, it is

13  impossible to copy something that does not exist.").  In <u>Christian v. Mattel</u>, the allegedly

14  infringing work was created six years before the allegedly infringed work, and the copyright

15  infringement claim was held to be frivolous.  286 F.3d at 1128.

16         In the present case, the following facts are undisputed.  Paraflex's Mr. Hillesland

17  completed the development of the Lucky Break *prototype* wishbone by January 27, 2004.

18  Rachman  Decl., Ex. 4 (Hillesland Dep.) at 25:10-20, 26:4-16, 51:19-22.  Y&R purchased

19  and received samples of Lucky Break's wishbones in June and July 2005.  Rachman Decl.,

20  Ex. 2 (Ahroni Dep.) at 80:10-24, 168:9-23; <u>id.</u>, Ex. 6 (Navratil Dep.) at 52:23-53:18; <u>id.</u>, Ex.

21  21 (Invoice to Y&R dated June 20, 2005).  Y&R provided these wishbones to Sears in July

22  2005.  <u>Id.</u>, Ex. 6 (Navratil Dep.) at 62:9-12, 63:19-24; <u>id.</u>, Ex. 7 (Katz Dep.) at 92:9-23.

23  Sears, in turn, provided a Lucky Break wishbone to Apex in August 2005.  <u>Id.</u>, Ex. 8 (Chiou

24  Dep.) at 39:18-40:2.  Paraflex's Mr. Hillesland completed the development of the Lucky

25  Break *production* wishbone by the end of September 2005.  Rachman  Decl., Ex. 4

26  (Hillesland Dep.) at 51:23-52:19.  Although the exact date of completion of the Sears

ORDER   21–

1   Wishbone is unknown, it was certainly completed by the time of the wishbone giveaway in

2   November 2005, and Lucky Break does not submit any evidence that Sears or Y&R had

3   access to the Lucky Break *production* wishbone prior to the creation of the Sears Wishbone.

4   Given this timing, the record clearly demonstrates, and Plaintiff does not dispute, that Sears

5   and Y&R had access only to Lucky Break's prototype wishbone, not to Lucky Break's

6   production wishbone, prior to the creation of the Sears Wishbone.

7        Sears and Y&R move for summary judgment based on their lack of access to Lucky

8   Break's production wishbone.  Defendants, in essence, argue that the production wishbone is

9   the "copyrighted work" that Lucky Break's copyright infringement claim is based upon.

10  Defendants confuse the issue of copyright protection and copyright registration.  While it is

11  true that Lucky Break only submitted a copy of the production wishbone as a deposit along

12  with its application for copyright registration, the prototype wishbone is nevertheless a

13  "copyrighted work."  And there is no dispute that Defendants had access to the prototype

14  wishbone.  Accordingly, the Court GRANTS IN PART Defendants' summary judgment

15  motion on the issue of access and DISMISSES IN PART Lucky Break's copyright

16  infringement claim – to the extent Lucky Break alleges that Defendants had access to and

17  copied the *production* wishbone.  The Court DENIES IN PART Defendants' summary

18  judgment motion and holds that Lucky Break's copyright infringement claim survives

19  summary judgment – to the extent Lucky Break alleges that Defendants had access to the

20  *prototype* wishbone.  See Second Am. Compl. ¶¶ 16-30.[10]

21  _____

22  [10] As a result of Lucky Break's deposit of a copy of only the *production* wishbone with the
    U.S. Copyright Office in connection with its application for copyright registration, the Court
23  is uncertain as to whether it has jurisdiction pursuant to 17 U.S.C. § 411(a) to entertain
    Lucky Break's copyright infringement claim based on Sears' alleged infringement of Lucky
24  Break's copyright in the *prototype* wishbone.  See Kodadek, 152 F.3d at 1211-12 (discussing
    deposit requirement of 17 U.S.C. § 408(b)); Seiler v. Lucasfilm, Ltd, 808 F.2d 1316, 1322
25  (9th Cir. 1986) (same); Coles v. Wonder, 283 F.3d 798, 801-802 (6th Cir. 2002) (same); but
    see 17 U.S.C. § 408(d) (addressing issue of supplementary registration); 37 C.F.R. § 201.5
26  (same).

ORDER   22–

1          **b.**     <u>**Copying (Similarities between Wishbones) – Defendants' Motion**</u>

2                <u>**for Summary Judgment**</u>

3              **i.**     <u>**Lucky Break's "Thin" Copyright**</u>

4        Realistic depictions of live animals can be protected by copyright. <u>Satava v. Lowry</u>,

5 323 F.3d 805, 812 (9th Cir. 2003) (glass sculpture of jellyfish); <u>Rachel</u>, 831 F.2d at 1507

6 (animal mannequins); <u>Kamar Int'l</u>, 657 F.2d at 1061 (stuffed toy animals). However, "the

7 scope of copyright protection in such works is narrow." <u>Satava</u>, 323 F.3d at 812. To the

8 extent the artistic choices are not governed by the animal's physiology or by the medium of

9 art, they are original elements that receive "thin" copyright protection. <u>Id.</u> Put another way,

10 a thin copyright "compris[es] no more than [the artist's] original contribution to ideas already

11 in the public domain." <u>Id.</u> In <u>Satava</u>, the Ninth Circuit held that the artist "may not prevent

12 others from copying aspects of his sculptures resulting from either jellyfish physiology or

13 from their depiction in the glass-in-glass medium." <u>Id.</u> at 810. The Court concludes as a

14 matter of law that Lucky Break's copyright is "thin." Lucky Break has also conceded that its

15 copyright is "thin." Rachman Decl., Ex. 1 (Transcript of Proceedings, Nov. 16, 2006) at

16 27:25 (Plaintiff's counsel stating, "I will concede that this is a thin copyright.").

17                **ii.**     <u>**"Virtually Identical" Test**</u>

18        "Virtually identical," not "substantially similar," is the standard for determining

19 whether a thin copyright has been copied, and thus infringed. <u>Satava</u>, 323 F.3d at 812

20 (quoting <u>Ets-Hokin v. Skyy Spirits, Inc.</u>, 323 F.3d 763, 766 (9th Cir. 2003) ("When we apply

21 the limiting doctrines, subtracting the unoriginal elements, Ets-Hokin is left with only a

22 'thin' copyright, which protects against only virtually identical copying")); <u>Apple Computer,</u>

23 <u>Inc. v. Microsoft Corp.</u>, 35 F.3d 1435, 1439 (9th Cir. 1994) ("When the range of protectable

24 and unauthorized expression is narrow, the appropriate standard for illicit copying is virtual

25 identity.").

26

In considering the similarities between works, the Ninth Circuit applies both an extrinsic test and an intrinsic test.  "[T]he extrinsic test . . . objectively considers whether there are substantial similarities in both ideas and expression, whereas the intrinsic test . . . measure[s] expression subjectively."  Apple Computer, 35 F.3d at 1442.  The extrinsic test is "based on external criteria; analytic dissection and expert testimony could be used."  Id.  The intrinsic test is a "test for similarity of expression from the standpoint of the ordinary reasonable observer, with no expert assistance."  Id.  The intrinsic test requires that the work's elements be viewed "as a whole."  Id. at 1443.  Because "the intrinsic test is inherently subjective," it is "often inappropriate for summary judgment."  Express, LLC v. Fetish Group, Inc., 424 F. Supp. 2d 1211, 1228 (C.D. Cal. 2006); see also Baxter, 812 F.2d at 424-25 (reversing district court's holding as a matter of law that there was no substantial similarity between the two works, noting that "[d]eterminations of substantial similarity of expression are subtle and complex"); Sid & Marty Krofft Television Prods., Inc. v. McDonald's Corp., 562 F.2d 1157, 1166 (9th Cir. 1977) ("the intrinsic test for expression is uniquely suited for determination by the trier of fact").

Defendants argue that the Sears Wishbone and the wishbone image in the Sears Circular are not virtually identical to the Lucky Break *production* wishbone.  This aspect of the motion is rendered moot by the Court's dismissal of Lucky Break's copyright infringement claim to the extent Lucky Break alleged infringement of the production wishbone.  Accordingly, the Court STRIKES IN PART Defendants' summary judgment motion on the issue of whether the Sears Wishbone and the wishbone image in the Sears Circular are virtually identical to the Lucky Break *production* wishbone.

Defendants also argue that the Sears Wishbone and the wishbone image in the Sears Circular are not virtually identical to the Lucky Break *prototype* wishbone.  There are genuine issues of material fact as to whether the Sears Wishbone and the wishbone image in the Sears Circular are virtually identical to the Lucky Break prototype wishbone.

ORDER   24–

1   Accordingly, the Court DENIES IN PART Defendants' summary judgment motion on the

2   issue of whether the Sears Wishbone and the wishbone image in the Sears Circular are

3   virtually identical to the Lucky Break *prototype* wishbone.

4   **3.   Copyright Infringement Claim Against Young & Rubicam – Defendants'**

5   **Motion for Summary Judgment**

6   Pursuant to this Order, the Court dismisses in part Lucky Break's copyright

7   infringement claim as alleged against both Defendant Sears and Defendant Young and

8   Rubicam (Y&R) – to the extent Lucky Break alleges that Defendants had access to the

9   *production* wishbone.  The Court also holds that Lucky Break's copyright infringement claim

10  survives summary judgment to the extent Lucky Break alleges that Defendants had access to

11  and copied the *prototype* wishbone.  Defendants argue that Lucky Break's copyright

12  infringement claim, Second Am. Compl. ¶¶ 29-30, should be dismissed in its entirety as to

13  Y&R because of Y&R's limited involvement in the allegedly infringing activities.  The Court

14  agrees.

15  Defendants argue that Y&R is not liable for direct or contributory copyright

16  infringement.  Plaintiff does not oppose Defendants' motion to dismiss Lucky Break's claim

17  of direct copyright infringement by Y&R.  The only issue in debate then is whether Y&R is

18  liable for contributory copyright infringement.  "One who, with knowledge of the infringing

19  activity, induces, causes or materially contributes to the infringing conduct of another may be

20  liable as a 'contributory' [copyright] infringer."  Ellison v. Robertson, 357 F.3d 1072, 1076

21  (9th Cir. 2004) (quoting Gershwin Publ'g Corp. v. Columbia Artists Mgmt., Inc., 443 F.2d

22  1159, 1162 (2d Cir. 1971)).  Thus, Lucky Break must show: (1) that Y&R "knew or had

23  reason to know of the infringing activity," and (2) that Y&R "materially contributed to the

24  infringing activity."  See id. at 1077.

25  It is undisputed that Y&R, on behalf of its client Sears, negotiated with Lucky Break

26  over the terms of the purchase of 1 to 2 million Lucky Break Wishbones.  Defendants argue

ORDER   25–

1   that negotiating, drafting, or holding agreements cannot form the basis for contributory

2   copyright infringement.  Defendants rely on <u>Calloway v. Marvel Entm't Group</u>, 82 Civ. 8697

3   (RWS), 1983 U.S. Dist. LEXIS 10506, at ** 5-6 (S.D.N.Y. Dec. 22, 1983), in which the

4   Court held that a law firm, which negotiated, drafted and held agreements between plaintiff

5   and the alleged infringers, could not be held liable as a contributory infringer.  Lucky Break

6   does not respond to Defendants' argument, thus impliedly conceding that the negotiations

7   between Y&R and Lucky Break cannot form the basis for contributory infringement.

8        Lucky Break asserts that numerous undisputed facts create an inference in its favor

9   that Y&R had knowledge of the infringing activity and/or materially contributed to the

10  alleged infringement.  However, none of the facts, outlined below, are supported by any legal

11  authority as a basis for contributory copyright infringement.

12       First, Y&R conceived of the "Wish Big" campaign, one aspect of which included the

13  idea of the wishbone giveaway.  Walters Resp. Decl., Ex. A (Katz Dep.) at 27-28, 42.  The

14  general notion of a "Wish Big" campaign, and even the specific idea of giving away

15  wishbones, does not form a basis for contributory copyright infringement because these ideas

16  do not show Y&R's knowledge of, or involvement in, Sears's alleged copying of the Lucky

17  Break prototype wishbone.

18       Second, Y&R provided Lucky Break prototype wishbones to Sears, the alleged

19  infringer.  Defendants point out, however, that Lucky Break provided the wishbones to

20  Y&R, and that Y&R, in turn, provided them to Sears under the authority of Lucky Break's

21  Mr. Ahroni.  Mr. Ahroni's uncontradicted deposition testimony is as follows:

22
23       Q:   Did you understand that Y&R was providing Sears with materials you
              were providing to Y&R?

24       A:   Presumably.

25       Q:   So they had your authority to do that?

26       A:   Yes.

ORDER   26–

Q:      And did you understand that Y&R was providing to its client a Lucky Break Wishbone itself?

A:      Presumably.

Q:      So they had your authority to do that as well?

A:      Yes.

Rachman Decl., Ex. 2 (Ahroni Dep.) at 163:5-16.  Defendants argue that merely providing copyrighted work to an alleged infringer does not give rise to contributory liability. Defendants rely on Herman Frankel Organization v. Tegman, 367 F. Supp. 1051, 1054 (E.D. Mich. 1973), in which the Court dismissed a copyright claim as to two defendants who procured copyrighted floor plans and gave them to another defendant who built a house using a copy of the copyrighted floor plans.  The Court dismissed the two "procurement" defendants because they played no role in copying the plans.  Id.  Similarly here, Lucky Break has failed to provide any evidence that Y&R played any role in the alleged copying of the Lucky Break prototype wishbone by Sears, Apex and/or its Chinese manufacturer. Lucky Break does not address Herman Frankel in its opposition brief.  The undisputed facts show that Y&R did not have any involvement with Apex regarding the manufacture of the Sears Wishbone.  Apex's owner, Mr. Chiou, testified that he negotiated the manufacture of the Sears Wishbone directly with former Sears's employee Bob Pflanz, and that Apex never had any conversations with Y&R and had not heard of Y&R prior to this lawsuit.  Rachman Decl., Ex. 8 (Chiou Dep.) at 25:15-26:3, 27:15-28:10, 45:23-48:10, 107:9-20.  Moreover, Y&R's Ms. Navratil testified that she did not know who Mr. Pflanz (at Sears) was prior to this lawsuit.  Id., Ex. 6 (Navratil Dep.) at 115:23-116:10.  There were no communications between Y&R and the persons at Sears or at Apex who were involved with the manufacture of the Sears Wishbone.  Y&R's provision of the Lucky Break prototype wishbones to Sears does not form a basis of contributory copyright infringement.

Third, Y&R designed the packaging, namely the cardboard topper and the product warning, to be used for the distribution of the Sears Wishbones.  Walters Resp. Decl., Ex. A

ORDER  27–

1   (Katz Dep.) at 42-43, Ex. C (Navratil Dep.) at 70-71, 82-83.  The product warning is the

2   subject of Plaintiff's new copyright infringement claim, <u>see</u> Second Am. Compl. ¶¶ 31-32,

3   and that alleged infringement is not presently before the Court.

4        Lucky Break's fourth factual basis for a contributory copyright infringement claim

5   against Y&R involves an email exchange.  Lucky Break asserts that Y&R "worked with

6   ABD in the production of the 'front cover' of the infringing circular [i.e., the Sears

7   Circular]."  Pl.'s Opp'n at 29:20-21 (citing Walters Resp. Decl., Ex. C (Navratil Dep.) at 91-

8   93).  Y&R's Ms. Navratil was copied on an email dated July 20, 2005 from Phyllis Cohn at

9   ABD, and the email says "Is there any other element, other than the wishbone, that we

10  should incorporate into the front cover?"  Walters Resp. Decl., Ex. C (Navratil Dep.) at 92:1-

11  93:16, Pl.'s Ex. 40 (email from ABD to Y&R).  Although the email requests input, there is

12  no evidence that Y&R acted in any way in response to this email.  When asked whether the

13  "ABD group was in charge of the creative side for the print ad," Ms. Navratil testified that

14  ABD group was "responsible for the circular."  <u>Id.</u>, Ex. C (Navratil Dep.) at 92:12-17.  She

15  testified that the "circular" is "what ABD produces for Sears."  <u>Id.</u>, Ex. C (Navratil Dep.) at

16  92:24-93:1.  She also testified that although Y&R "ha[s] contact with [ABD] . . . we don't

17  collaborate."  <u>Id.</u>, Ex. C (Navratil Dep.) at 98:10-16.  In fact, Y&R did not see the Sears

18  Circular prior to its release.  Rachman Decl., Ex. 6 (Navratil Dep.) at 43:22-44:8.  Lucky

19  Break further asserts that as of July 20, 2005, Y&R knew that ABD needed a wishbone to

20  photograph for the Sears Circular sometime between August 26, 2005 and September 2,

21  2005.  <u>Id.</u>, Ex. C (Navratil Dep.) at 99, Pl.'s Ex. 41 (email from Y&R to Sears).  As of July

22  20, 2005, however, Y&R was recommending that Lucky Break should be the vendor of

23  wishbones for the promotion, <u>id.</u>, Ex. C (Navratil Dep.) at 99:12-100:1, Pl.'s Ex. 31

24  (showing that as late as Aug. 4, 2005, Y&R believed that Sears had approved Lucky Break).

25  Thus, no inference of infringement can possibly be made as a result of the July 20, 2005

26

ORDER   28–

email exchanges between Y&R and ABD's Phyllis Cohn, and between Y&R and Sears's Ms. Katz.

In the absence of any evidence of direct or contributory copyright infringement by Y&R, the Court GRANTS Defendants' summary judgment motion and DISMISSES Lucky Break's copyright infringement claim as alleged against Y&R in the Second Amended Complaint, ¶¶ 29-30.

## CONCLUSION

The Court GRANTS the deferred portion of Plaintiff's summary judgment motion, docket no. 84, and GRANTS IN PART, DENIES IN PART and STRIKES IN PART the deferred portions of Defendants' summary judgment motion, docket no. 87, as follows:

a. The Court GRANTS Plaintiff's summary judgment motion, and DENIES Defendants' summary judgment motion, on the issues of originality and utility, and holds that Lucky Break owns a valid copyright in both the Lucky Break prototype wishbone and the Lucky Break production wishbone.

b. On the issue of access, the Court GRANTS IN PART and DENIES IN PART Defendants' summary judgment motion. The Court GRANTS IN PART Defendants' motion on the issue of access and DISMISSES IN PART Lucky Break's copyright infringement claim – to the extent Lucky Break alleges that Defendants had access to the *production* wishbone. The Court DENIES IN PART Defendants' motion and holds that Lucky Break's copyright infringement claim survives summary judgment – to the extent Lucky Break alleges that Defendants had access to the *prototype* wishbone.

c. On the issue of whether the Sears Wishbone and the wishbone image in the Sears Circular are virtually identical to the Lucky Break wishbones, the Court STRIKES IN PART and DENIES IN PART Defendants' motion. The Court STRIKES IN PART the motion as it relates to the production wishbone. The

1    Court DENIES IN PART the motion as it relates to the prototype wishbone

2    because of genuine issues of material fact.

3    d.    On the issue of Y&R's infringement, the Court GRANTS Defendants'

4          summary judgment motion and DISMISSES Lucky Break's copyright

5          infringement claim as alleged against Y&R in the Second Amended Complaint,

6          ¶¶ 29-30.

7

8    IT IS SO ORDERED.

9    DATED this 4th day of December, 2007.

10

11   Thomas S. Zilly

12   Thomas S. Zilly
     United States District Judge

13

14

15

16

17

18

19

20

21

22

23

24

25

26

ORDER   30–