UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| LUCKY BREAK WISHBONE CORPORATION,<br><br>　　　　　　Plaintiff,<br><br>v.<br><br>SEARS, ROEBUCK AND CO., a New York corporation, and YOUNG AND RUBICAM INC., a Delaware corporation,<br><br>　　　　　　Defendants. | No. C06-312Z<br><br>ORDER |

THIS MATTER initially came before the Court on a motion in limine brought by defendant Sears, Roebuck & Co. ("Sears"), docket no. 220, seeking to exclude the testimony of plaintiff's expert, Michael A. Belch. After reviewing the briefing and considering the oral arguments of counsel, the Court granted in part Sears's motion in limine and ruled that Mr. Belch will not be permitted to testify because his opinions and calculations concerning indirect profits are too speculative. *See* Minutes of June 9, 2008 (docket no. 256). The question subsequently arose whether, absent Mr. Belch's testimony, plaintiff could present a case for recovery of indirect profits. The Court granted leave to plaintiff to present in its trial brief an offer of proof as to indirect profits. Having reviewed plaintiff's brief, docket no. 254, and Sears's response thereto, docket no. 258, the Court is unpersuaded that plaintiff has any non-speculative evidence concerning the sales generated by the allegedly infringing wishbone on the day it was distributed, *i.e.*, the first day of the promotion period, and

ORDER  1–

1  plaintiff will be precluded from offering evidence about the gross or net revenues received by
2  Sears on November 19, 2005.
3  **Background**
4        In this action, plaintiff Lucky Break Wishbone Corp. alleges that Sears infringed its
5  copyrighted breakable plastic turkey wishbone by using a photographic image of the
6  wishbone in printed advertisements and distributing virtually identical wishbones as part of a
7  promotion during the week preceding the 2005 Thanksgiving holiday.  The promotion took
8  place from Saturday, November 19, through Wednesday, November 23, 2005, and it is
9  referred to by the parties as the "Wishbone Promotion."  The Wishbone Promotion was
10 announced to the public in circulars distributed with newspapers nationwide on November
11 19, 2005.  On the front of the eight-page circulars, a small image of a wishbone appeared
12 together with text indicating that "today only" a consumer could obtain "with any purchase"
13 a "wish big wishbone" and a coupon for $10 off the next purchase.  *See* Exh. 23 to Rachman
14 Decl. (docket no. 92).
15       On November 19, 2005, Sears distributed 1,000,800 blue plastic wishbones, bearing
16 the words "wish big" in white letters, in quantities of 1,000 per full line, grand, and
17 essentials store, and 600 per hardware store.  *See* Illes Report at ¶ 11, Exh. D to Walters
18 Decl. (docket nos. 230 & 232).  Each wishbone was contained in a clear package that was
19 stapled to a $10 coupon.  The $10 "bounce back" coupon was redeemable on the subsequent
20 four days, November 20-23, 2005.  *Id.* at ¶ 12.  Of the 1,000,800 bounce back coupons
21 distributed, only 2.53% were actually redeemed.  *Id.*
22       The gross revenue associated with the first 1,000 or 600 sales, respectively, at
23 participating stores on November 19, 2005, was $79,851,256.  Plaintiff's Trial Brief at 15
24 n.5 (docket no. 254) (citing Tr. Exh. 145).  The gross revenue associated with redemption of
25
26

ORDER  2–

the $10 "wishbone" coupons during the period November 20-23, 2005, was $4,021,213.[1] Illes Report at ¶ 24, Exh. D to Walters Decl. Plaintiff now seeks to recover as indirect profits the aggregate of these two numbers, or roughly $84 million.

**Discussion**

An infringer of copyright is liable for "the copyright owner's actual damages and any additional profits of the infringer," as those terms are defined by the Copyright Act. 17 U.S.C. § 504(a). Actual damages are those suffered by the copyright owner "as a result of the infringement." 17 U.S.C. § 504(b). Profits of the infringer are those that are "attributable to the infringement and are not taken into account in computing the actual damages." *Id.* The Copyright Act articulates a two-part, burden-shifting scheme for establishing an infringer's profits: (i) the copyright owner bears the burden of presenting proof of the infringer's gross revenue; and (ii) the infringer bears the burden of proving deductible expenses and the elements of profit attributable to factors other than the copyrighted work. *Id.*; *see Frank Music Corp. v. Metro-Goldwyn-Mayer, Inc.*, 772 F.2d 505, 514 (9th Cir. 1985). Any doubt concerning the calculation of profits is to be resolved in favor of the copyright owner. *Frank Music*, 772 F.2d at 514.

Profits may be direct or indirect, and are recoverable if "ascertainable." *Id.* at 517; *see also Polar Bear Prods., Inc. v. Timex Corp.*, 384 F.3d 700, 708 (9th Cir. 2004) ("Profits indirectly gained from infringements used in promotional efforts, as is the case here, fall squarely within the rubric of wrongful profits."). With regard to both actual damages and profits, the copyright owner must establish "a causal relationship between the infringement and the profits generated indirectly from such infringement." *Polar Bear*, 384 F.3d at 714 n.10. The Court has a duty to "conduct a threshold inquiry into whether there is a legally

---

[1] Plaintiff proposes to use the figure $5,150,045, which is the gross revenue related to all coupons, not just the $10 "wishbone" coupon, during the time period in question. *See* Plaintiff's Trial Brief at 15 & n.4 (docket no. 254). The Court defers to trial the issue whether plaintiff may proffer the higher coupon redemption sales amount.

ORDER  3–

sufficient causal link between the infringement and subsequent indirect profits," and the Court may preclude recovery if the copyright owner's proffered evidence of causation is too speculative. *Mackie v. Rieser*, 296 F.3d 909, 914-15 (9th Cir. 2002).

Here, plaintiff has identified two types of transactions as to which it seeks indirect profits: the "giveaway sales" occurring on November 19, when wishbones and coupons were distributed to the first 1,000 or 600 customers at participating stores, and the "redemption sales" occurring during the period November 20-23, when the "wishbone" coupons were used to make purchases. The total figure ($84 million) that plaintiff now describes is substantially higher than the amount advanced under the theories of its now excluded expert, Mr. Belch. Mr. Belch had proffered two alternative methods of calculating the indirect profits attributable to Sears's alleged infringement of plaintiff's copyrighted wishbone -- one based on the newspaper circulars[2] and the other based on the purchase transactions.[3] The newspaper circular method yielded $12.6 million in gross sales, while the purchase transaction method generated roughly $20 million in gross revenue. Both methods relied upon improper extrapolation from the results of a dubious survey conducted by Mr. Belch, as well as just plain guesswork. At oral argument, plaintiff's counsel could not explain how

---

[2] Mr. Belch assumed that 10% of the circulars distributed nationwide would actually be viewed and synthesized, that 44% of the individuals aware of the circular would visit a Sears store, and that 10% of those who went to a store would make a purchase. Belch Report at 12-13, Exh. 3 to Rachman Decl. (docket no. 223). Using the number of circulars distributed nationwide (39.35 million) and an average purchase amount ($73 per transaction), Mr. Belch derived a gross sales amount of $12,639,220. Belch Supp. Report at 2-3, Exh. 3 to Rachman Decl. (docket nos. 184 & 186).

[3] Mr. Belch assumed that 26% of the individuals who made purchases on November 19, 2005, were induced to do so by the promise of a free wishbone. Belch Report at 19, Exh. 3 to Rachman Decl. (docket no. 223). Using the number of wishbones distributed nationwide (roughly 1 million) and an average purchase amount ($73 per transaction), Mr. Belch calculated a gross sales figure of $18,980,000 for the first 1,000 or 600 sales per store on November 19. Belch Supp. Report at 4-5, Exh. 3 to Rachman Decl. (docket nos. 184 & 186). With regard to redemption transactions, Mr. Belch assumed that 24% of the individuals using the $10 bounce back coupon retained and redeemed the coupon as a result of the wishbone. Belch Report at 20. Using the gross revenue associated with all coupons during the period from November 20-23 ($5,150,045), Mr. Belch computed a gross sales amount of $1,236,011 for the redemption period. Belch Supp. Report at 6. Adding the numbers for November 19 and November 20-23, Mr. Belch arrived at a total gross revenue of $20,216,011.

ORDER   4–

Mr. Belch arrived at his assumptions or derived his estimates. Moreover, with respect to sales associated with the wishbone giveaway, plaintiff's counsel failed to rule out the most obvious and likely scenario, namely that consumers did not discover they were entitled to a wishbone and a $10 coupon until after they had made their purchase decision and were at the register with cash or credit card in hand. Given the entirely speculative nature of Mr. Belch's analysis, the Court held that he would not be permitted to testify at trial.

With respect to the giveaway sales on November 19, plaintiff now comes forward with even more attenuated evidence of indirect profits. The only evidence of causation that plaintiff cites in its trial brief is a document in which Sears described the Wishbone Promotion as a "traffic driving event." *See* Plaintiff's Trial Brief at 16 (docket no. 254) (citing Tr. Exh. A-88). This statement lacks the specificity needed to draw a relationship between the allegedly infringing wishbone and the giveaway sales. Instead of evidence, plaintiff proffers bold, unsupported assertions. Plaintiff states that

> "[a] causal connection between the infringement and at least *some* of the sales on November 19 may be inferred by the jury," *id.* at 15 (emphasis in original);
>
> "[c]ommon sense suggests that Sears would have had fewer sales on November 19 had it not conducted this event as an incentive to purchase," *id.* at 16;
>
> "the jury may infer that the advertising and promotional activities *in this case* drove sales," *id.* (emphasis in original);
>
> "[i]t would be unreasonable to conclude that no customer saw [the circular] or that no sale on November 19 owes its origin 'at least partially' to [the circular]," *id.*;
>
> "[t]he infringing circular in this case was likely more effective at increasing sales than the average circular," *id.* at 18; and
>
> "[t]he jury is entitled to infer that when a company gives something away free with purchase, sales likely go up," *id.*

Plaintiff further reasons that the amount Sears spent on the promotion, including the cost of the eight-page circular and the 1,000,800 wishbones, indicates that the promotion was anticipated to increase sales. Plaintiff, however, presents no evidence that Sears's hopes

ORDER   5–

were fulfilled, that the promotion was successful, or that the wishbone played any part in even a single purchase on November 19, 2005.

As the Ninth Circuit has made clear, "a copyright owner is required to do more initially than toss up an undifferentiated gross revenue number; the revenue stream must bear a legally significant relationship to the infringement." *Polar Bear*, 384 F.3d at 711. "[A] plaintiff seeking to recover indirect profits must 'formulate the initial evidence of gross revenue duly apportioned to relate to the infringement.'" *Id.* (quoting 4 NIMMER ON COPYRIGHT § 14.03[B], 14-39). Plaintiff here has failed to do so, at least with regard to the giveaway sales on November 19, 2005. Numerous factors other than the Wishbone Promotion might have played a role in consumers' decisions to make purchases at Sears stores on November 19, 2005, including the sale prices, rebates, extended store hours, and financing arrangements that were available that day, as well as the location of the store or perhaps just the day of the week, which was the Saturday preceding the Thanksgiving holiday.

In this regard, this case is closely analogous to *Mackie*, in which the Ninth Circuit found that the relationship between the copyright owner's work, which appeared in derivative form in a promotional brochure for the Seattle Symphony, and the desired indirect profits was too tenuous because sales could have been generated by reasons having nothing to do with the artwork at issue, including the Symphony's reputation, the conductor, a specific musician, the dates of the concerts, the then new Benaroya Hall, the program, the featured composers, "community boosterism," or "simply a love of music." 296 F.3d at 916. The *Mackie* Court reasoned that "[i]n the absence of concrete evidence, Mackie's theory is no less speculative than our effort in this paragraph to enumerate even a relatively short list of the myriad factors that could influence an individual's purchasing decisions." *Id.* Likewise, here, plaintiff's assertion that the allegedly infringing wishbone generated "some," "higher," "increased," or "additional" sales on November 19, 2005, is pure conjecture.

ORDER   6–

1  Moreover, plaintiff's suggestion that the jury could make various inferences, including that
2  the promotion "drove" sales, that sales "go up" with giveaways, or that a causal connection
3  exists as to "some" sales, "stretches the causation rubber band to its breaking point." *Polar*
4  *Bear*, 384 F.3d at 714.

5  In contrast, with respect to redemption sales during the period November 20-23, 2005,
6  the Court concludes that plaintiff has provided sufficient non-speculative evidence to
7  proceed to trial on this theory. The Court, however, defers until trial whether this issue will
8  ultimately be given to the jury after plaintiff's case has been presented. As an initial matter,
9  the Court observes that the allegedly infringing wishbone was attached to the $10 "bounce
10 back" coupons when they were distributed. This type of physical proximity is some
11 evidence of a causal relationship. *See Polar Bear*, 384 F.3d at 704, 712 (finding that indirect
12 profits were reasonably approximated with respect to 10% to 25% of the sales generated at
13 trade show booths where the infringing promotional "loop tape" was played). The higher
14 redemption rate for the $10 wishbone coupon is also some evidence of a causal relationship.
15 The $10 wishbone coupon was redeemed at a rate of 2.53%, while three other "bounce back"
16 coupons, simply printed on register tape and distributed during the 2005 holiday period, were
17 redeemed at an average rate of 1.45%. *See* Illes Report at ¶¶ 15-23, Exh. D to Walters Decl.
18 (docket nos. 230 & 232). This data suggests that approximately 42.7% of the redemption
19 sales during the period November 20-23, 2005, might be attributable in part to the wishbone,
20 as opposed to the $10 coupon alone. Thus, the Court will permit plaintiff to offer evidence
21 concerning the gross sales associated with coupons redeemed during the period November
22 20-23, 2005, with Sears bearing the burden of proving "deductible expenses and the elements
23 of profit attributable to factors other than the copyrighted work."
24 ///
25 ///
26 ///

ORDER  7–

IT IS SO ORDERED.

DATED this 26th day of June, 2008.

_____
Thomas S. Zilly
United States District Judge

ORDER  8–