UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| LUCKY BREAK WISHBONE CORPORATION, | |
|---|---|
| Plaintiff, | No. C06-312Z |
| v. | ORDER |
| SEARS, ROEBUCK AND CO., a New York corporation, and YOUNG AND RUBICAM INC., a Delaware corporation, | |
| Defendants. | |

THIS MATTER comes before the Court on defendants' motion pursuant to Fed. R. Civ. P. 50(b) for judgment as a matter of law or, alternatively, for remittitur pursuant to Fed. R. Civ. P. 59, docket no. 284. Having reviewed all papers filed in support of and in opposition to the motion, as well as the remainder of the record, the Court DENIES both the motion for judgment as a matter of law and the alternative request for remittitur. The Clerk is directed to enter JUDGMENT in favor of plaintiff and against defendants, consistent with the jury's verdict.

**Background**

In this action, plaintiff Lucky Break Wishbone Corporation ("Lucky Break") alleged that Sears Roebuck & Company ("Sears") infringed plaintiff's copyrighted breakable plastic sculpture resembling a turkey wishbone (the "Lucky Break Wishbone") by distributing

ORDER 1–

virtually identical plastic wishbones as part of a promotion during the week preceding the 2005 Thanksgiving holiday. On Saturday, November 19, 2005, Sears distributed 1,000,800 blue plastic wishbones, bearing the words "wish big" in white letters. Each wishbone was contained in a clear package that was stapled to a $10 "bounce back" coupon. The $10 coupon was redeemable on the subsequent four days, November 20-23, 2005. Of the 1,000,800 bounce back coupons distributed on the first day of the promotion, approximately 2.5% were eventually redeemed.

Sears was assisted in the "Wish Big" promotion by Young and Rubicam Inc. ("Y&R"), an advertising and marketing company. Y&R contacted Lucky Break during June 2005 and obtained samples of the Lucky Break Wishbone, which Y&R provided to Sears. Sears subsequently sent at least one of these samples to Apex Products, LLC, an Illinois-based company, which eventually contracted with a manufacturer in China to produce plastic wishbones at a cost significantly below the prices quoted by Lucky Break. Y&R also received from Lucky Break the text for a product warning, which was later used on the packaging for the wishbones Sears gave away during the promotion. Based on Y&R's involvement with the promotion, Lucky Break asserted against Y&R, as well as Sears, a separate claim of infringement relating to the product warning.

After approximately five days of trial and roughly five hours of deliberation, the jury returned a verdict in favor of plaintiff on both of its claims of infringement. As to Sears's infringement of the Lucky Break Wishbone, the jury awarded $190,152 in actual damages and $1,479,404 in profits attributable to the infringement. As to both defendants' infringement of the product warning, the jury awarded $30,024 in actual damages. Defendants now move for judgment as a matter of law with regard to the jury's finding of infringement of the Lucky Break Wishbone and the jury's overall calculation of damages, or in the alternative for remittitur of the awards on both infringement claims.

**Discussion**

**A.     Standard for Judgment as a Matter of Law**

A jury's verdict must be upheld if it is supported by substantial evidence. *Wallace v. City of San Diego*, 479 F.3d 616, 624 (9th Cir. 2007). Evidence is substantial if it is adequate to support the jury's conclusions even if drawing a contrary conclusion from the evidence is possible. *Id.* In ruling on a motion for judgment as a matter of law, the Court may not make credibility determinations or weigh the evidence. *Winarto v. Toshiba Am. Elecs. Components, Inc.*, 274 F.3d 1276, 1283 (9th Cir. 2001). The Court must draw all inferences from the evidence in the light most favorable to the nonmoving party, and it must disregard all evidence favorable to the moving party that the jury was not required to believe. *Id.* The Court may not substitute its judgment for that of the jury, *id.*, and it may grant judgment as a matter of law only when the evidence, appropriately viewed, permits only one reasonable conclusion, which runs contrary to the jury's verdict, *Wallace*, 479 F.3d at 624.

**B.     Infringement of Lucky Break Wishbone**

The Lucky Break Wishbone is manufactured using the injection molding process, whereby molten plastic is forced at high pressure into a two-part mold and then quickly cooled before being ejected by moving pins. As a first step toward creating the mold for the Lucky Break Wishbone, Cimtech Inc. ("Cimtech") scanned a natural turkey wishbone provided by Ken Ahroni, the owner of Lucky Break. Cimtech's three-dimensional scan has been analogized to a photocopy produced at the ubiquitous Kinko's Copy Center, now known as FedEx Office. Cimtech provided the scanned data to Lucky Break. *See* Stipulated Facts, Instruction No. 5 at ¶ 7 (docket no. 273). From the scanned data, a computer model was generated. The computer model was used to create graphite electrodes, which were hand-altered in some respects by Dale Hillesland of Paraflex, Inc., and which were in turn used to make the mold for the Lucky Break Wishbone. *See id.* at ¶¶ 7 & 8.

The current dispute centers around alleged uncertainty concerning who or which entity created the computer model from which the graphite electrodes, and eventually the mold for the Lucky Break Wishbone, were produced. Sears contends that the computer model, admitted as Exhibit A-90-A, *see* Exh. 11 to Roller Decl. (docket no. 285), contains the seven elements that Lucky Break's ornithological expert, David W. Steadman, Ph.D., opined distinguished the Lucky Break Wishbone from a natural turkey wishbone. Sears also claims that the computer model was generated by Cimtech and that, therefore, the seven differences between the Lucky Break Wishbone and a natural turkey wishbone were not the result of work performed by Dale Hillesland, the author of the sculpture known as the Lucky Break Wishbone. Based on these factual assertions, Sears argues that Lucky Break failed to present sufficient evidence of originality to warrant a jury verdict of infringement.

In contrast, Lucky Break points to circumstantial evidence indicating that the computer model was not Cimtech's work. For example, Cimtech issued an invoice on December 19, 2003, but the computer model was not created until December 22, 2003, suggesting that Cimtech did not generate the model. Moreover, Cimtech scanned only half of the natural turkey wishbone, but the computer model is a complete wishbone. In addition, Lucky Break contends that, because the computer model contains the seven distinguishing features of the Lucky Break Wishbone, the model cannot be a mere copy or reproduction of a natural turkey wishbone and must therefore reflect more than just Cimtech's contribution to the work. Alternatively, Lucky Break argues that, even if Cimtech created the computer model, Dale Hillesland is no less an "author" of the Lucky Break Wishbone because an author entitled to copyright protection may incorporate the work of others.

The controversy regarding the origin of the computer model stems in part from the parties' respective strategic or reasoned decisions concerning the subpoenaing and calling of witnesses. For example, Lucky Break chose not to subpoena or call Dale Hillesland as a witness, and it did not put on the stand its disclosed injection-molding expert, Axel Sommer.

ORDER 4–

Similarly, after Lucky Break rested and the Court deferred ruling on Sears's motion for directed verdict (technically, a motion for judgment as a matter of law pursuant to Fed. R. Civ. P. 50(a)), Sears opted not to offer the testimony of Steve Kidd, founder and president of Cimtech, or of plastics expert Michael Lubov,[1] both of whom were listed in the Pretrial Order as potential defense witnesses. Thus, the alleged mystery concerning the genesis of the computer model is not due to unavailability of information, but rather to the parties' choices at trial.

In the end, however, the mystery is easily solved by resort to the standards applicable to a motion for judgment as a matter of law. In considering Sears's motion, the Court must draw all reasonable inferences in favor of Lucky Break and must discount evidence favorable

---

[1] The parties' decisions not to call their respective manufacturing experts resulted in a dearth of evidence concerning whether any of the seven features distinguishing the Lucky Break Wishbone from a natural turkey wishbone were purely functional elements, perhaps necessary for the injection-molding process or serving to make the plastic sculpture easier to break, thereby better simulating an actual wishbone. To the extent that Lucky Break's claim of infringement is based on the copying of functional elements, it is not cognizable. *See, e.g.*, *Decorative Aides Corp. v. Staple Sewing Aides Corp.*, 497 F. Supp. 154, 157 (S.D.N.Y. 1980). In its motion for directed verdict, however, Sears did not raise the argument that Lucky Break failed to prove one or more of the Lucky Break Wishbone's seven distinctive characteristics are non-functional. Sears is therefore precluded from presenting such argument in a post-verdict motion for judgment as a matter of law. *See* *Freund v. Nycomed Amersham*, 347 F.3d 752, 761 (9th Cir. 2003) ("A party cannot raise arguments in its post-trial motion for judgment as a matter of law under Rule 50(b) that it did not raise in its pre-verdict Rule 50(a) motion."). For presumably tactical reasons, Sears has not combined its motion for judgment as a matter of law with an alternative motion for new trial; Sears asks only for remittitur of the verdict amount. The Court has nevertheless considered whether the absence of evidence concerning functionality would warrant a new trial, which the Court could grant sua sponte after providing the parties notice and an opportunity to be heard. *See* Fed. R. Civ. P. 59(d). The Court is not, however, persuaded that a new trial is justified. Although disagreement exists, the Ninth Circuit has held that the doctrines of merger and scènes à faire constitute defenses to infringement, rather than elements of copyrightability. *Ets-Hokin v. Skyy Spirits, Inc.*, 225 F.3d 1068, 1082 (9th Cir. 2000); *see also* *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 387 F.3d 522, 557 (6th Cir. 2004) (Feikens, D.J., sitting by designation, concurring in part and dissenting in part) (noting the circuit split concerning which "my colleagues have declined to take a position," and opining that, in the method of operation context, the merger doctrine operates only as a defense to infringement). The doctrine of functionality is closely related and the Court can discern no basis for treating it differently in allocating the burden of proof. Thus, the jury was correctly instructed that Sears bore the burden of proving the expression embodied in the Lucky Break Wishbone "necessarily flows from functional considerations," Instruction No. 20 (docket no. 273), and the lack of evidence regarding functionality inured to Lucky Break's benefit. To the extent that the Court's instructions improperly placed the burden of proof on Sears, Lucky Break was well aware of the paucity of Ninth Circuit authority directly on point, and it could have protected its position by offering evidence of non-functionality even though the jury was advised it bore no burden to do so. Having given due consideration to the various issues, the Court will not now, via the vehicle of a new trial, relieve the parties of the consequences of their respective strategic decisions.

ORDER 5–

to Sears that the jury was not required to believe. Here, the parties stipulated that Cimtech "scanned a real turkey wishbone and provided the scanned data to Lucky Break." Instruction No. 5 (docket no. 273). The parties further stipulated that the computer model "was created from the scanned data." <u>Id.</u> From this evidence alone, the jury could, and the Court must, infer that someone or some entity other than Cimtech manipulated the data to create the computer model; Cimtech turned over to Lucky Break the scanned data necessary to generate the model, thereby relinquishing the information required to perform the work. To the extent Sears offered evidence tending to contradict this inference, the jury was not required to believe it in light of the parties' stipulation. In addition, the evidence at trial suggested that Cimtech completed its tasks before December 19, 2003, when it issued an invoice, but that the computer model was produced three days later, namely December 22, 2003. Thus, substantial evidence supports the conclusion that someone or some entity other than Cimtech created the computer model containing the seven features of the Lucky Break Wishbone that distinguish it from a natural turkey wishbone,[2] and Sears's argument to the contrary does not

---

[2] Sears does not identify anyone other than Cimtech as the possible engineer of the computer model. The list of suspects is not long -- the only other person with access to the scanned data and the capability to create such model was Dale Hillesland. Indeed, in connection with cross-motions for summary judgment in this case, Sears did not challenge Mr. Hillesland's deposition testimony that he made changes to the data set before generating the computer model. <u>See</u> Order at 16-17 (docket no. 140). Although he did not similarly testify at trial, the jury was provided sufficient evidence, including the parties's stipulations, from which it could reasonably infer that Dale Hillesland was responsible for incorporating into the computer model the seven features distinguishing the Lucky Break Wishbone from a natural wishbone. More importantly, though, Sears's apparent contention that Lucky Break was required to prove the seven characteristics at issue were contributed solely by Dale Hillesland is inconsistent with copyright law and the law of this case. As reflected in both the Ninth Circuit's pattern jury instructions and the Court's instructions in this case, the help or creative contributions of others do not undermine a person's status as an author of a copyrighted work so long as the person caused the work to "come into being" by translating an idea into a "fixed, tangible expression." <u>See</u> Ninth Circuit Pattern Instruction No. 17.6; Instruction No. 15B (docket no. 273). Here, the jury was advised that Dale Hillesland is the author of the Lucky Break Wishbone and that "[i]t is his contribution . . . that can be protected by plaintiff's copyright in this case." Instruction No. 15B. Lucky Break excepted to the entire instruction on the ground that Sears did not properly plead an authorship defense. Tr. Transcript at 582:9-22 (docket no. 280). In addition, Lucky Break successfully challenged Sears's proposed inclusion of the modifier "only," which would have resulted in the instruction reading in relevant part, "It is only his contribution . . . that can be protected." The Court omitted the term "only" because it would have inappropriately precluded Lucky Break from arguing that persons other than Dale Hillesland contributed to the embodiment at issue. Tr. Transcript at 598:2-6 (docket no. 280). In sum, Sears's argument that Lucky Break failed to delineate which of the protected elements of the Lucky Break Wishbone resulted solely from Mr. Hillesland's work constitutes a meritless and untimely attack on authorship.

ORDER 6–

justify judgment as a matter of law in its favor. Defendants' motion for judgment as a matter of law, docket no. 284, is DENIED.

**C.    Damages**

    **1.    Applicable Standards**

An infringer of a copyright is liable for "the copyright owner's actual damages and any additional profits of the infringer," as those terms are defined by the Copyright Act. 17 U.S.C. § 504(a). Actual damages are those suffered by the copyright owner "as a result of the infringement." 17 U.S.C. § 504(b). Profits of the infringer are those that are "attributable to the infringement and are not taken into account in computing the actual damages." *Id.* The Copyright Act articulates a two-part, burden-shifting scheme for establishing an infringer's profits: (i) the copyright owner bears the burden of presenting proof of the infringer's gross revenue; and (ii) the infringer bears the burden of proving deductible expenses and the elements of profit attributable to factors other than the copyrighted work. *Id.*; *see Frank Music Corp. v. Metro-Goldwyn-Mayer, Inc.*, 772 F.2d 505, 514 (9th Cir. 1985). Any doubt concerning the calculation of profits is to be resolved in favor of the copyright owner. *Frank Music*, 772 F.2d at 514.

Profits may be direct or indirect, and are recoverable if "ascertainable." *Id.* at 517; *see also Polar Bear Prods., Inc. v. Timex Corp.*, 384 F.3d 700, 708 (9th Cir. 2004) ("Profits indirectly gained from infringements used in promotional efforts, as is the case here, fall squarely within the rubric of wrongful profits."). With regard to both actual damages and profits, the copyright owner must establish a causal link between the infringement and the monetary remedy sought. *Polar Bear*, 384 F.3d at 708. The Court may preclude recovery if the copyright owner's proffered evidence of causation is too speculative. *Mackie v. Rieser*, 296 F.3d 909, 914-15 (9th Cir. 2002).

The Court, however, may not disturb a jury's award of damages unless it is "clearly unsupported by the evidence," or "grossly excessive," "monstrous," or "shocking to the

ORDER   7–

conscience." *Brady v. Gebbie*, 859 F.2d 1543, 1557 (9th Cir. 1988). Moreover, the Court may not unilaterally reduce the amount of damages without running afoul of the Seventh Amendment right to a jury trial. *See* <u>Kennon v. Gilmer</u>, 131 U.S. 22, 29 (1889) ("no court of law . . . is authorized, according to its own estimate of the amount of damages which the plaintiff ought to have recovered, to enter an absolute judgment for any other sum than that assessed by the jury"). If the Court determines that the verdict should be decreased, the Court must offer plaintiff the option of either accepting a remittitur or submitting to a new trial. <u>Fenner v. Dependable Trucking Co.</u>, 716 F.2d 598, 603 (9th Cir. 1983). On the other hand, if the jury's award finds substantial support in the record and falls within "the range sustainable by the proof," the Court must resist any temptation to "play Monday morning quarterback" or supplant the jury's evaluation with its own. <u>Los Angeles Memorial Coliseum Comm'n v. Nat'l Football League</u>, 791 F.2d 1356, 1366 (9th Cir. 1986).

### 2. **Actual Damages**

Sears challenges the jury's awards of actual damages with respect to both claims of infringement, namely the $190,152 assessed for infringement of the Lucky Break Wishbone and the $30,024 imposed for infringement of the product warning. In support of the jury's verdict, Lucky Break observes that each award is exactly divisible by the undisputed number of infringing items, thereby evidencing that the jury calculated a value of 19¢ per wishbone and 3¢ per product warning. At trial, the parties stipulated that Sears obtained all of the 1,000,800 infringing wishbones at a cost of $170,136, or 17¢ each. *See* Instruction No. 5 at ¶ 17 (docket no. 273). The jury was also informed that Lucky Break had quoted a price of 19.7¢ per wishbone, and 29.3¢ per unit including printed packaging. Tr. Exhs. 63 & 68, Exh. F to Walters Decl. (docket no. 288). Moreover, the jury was provided evidence that Sears's actual packaging cost was a little over 7¢ per item. *See* Tr. Exh. 118, Exh. F to Walters Decl. Based on this record, the jury could have reasonably derived the values of 19¢ per wishbone and 3¢ per product warning, the latter quantity representing the difference

ORDER 8–

between Lucky Break's quoted price for packaging (10¢ each) and Sears's actual cost (7¢ each). The Court concludes that the jury's verdict is amply supported by the evidence and not in the least "shocking to the conscience." Therefore, defendants' motion for judgment as a matter of law or remittitur as to actual damages is DENIED.

### 3. **Indirect Profits**

With respect to the jury's award of profits attributable to the infringement of the Lucky Break Wishbone, Sears argues that Lucky Break failed to present sufficient non-speculative evidence of causation and that the jury failed to properly apportion between infringement and other factors. Neither contention has merit. The evidence indicated that the $10 bounce back coupons distributed with infringing wishbones were redeemed at a higher rate than other coupons during the same holiday period (2.53% as compared with an average of 1.45%). The jury was entitled to infer that the elevated redemption rate was due to the infringing wishbones, perhaps because they served to call more attention to the bounce back coupons, to remind consumers about the coupons, or to promote retention rather than disposal of the coupons. Thus, Lucky Break met its burden of establishing an "attenuated nexus," and thus, the causal link necessary for the recovery of indirect damages. *See Mackie*, 296 F.3d at 914.

The burden then fell on Sears to prove deductible expenses, as well as the portion of its profit that was attributable to factors other than infringement. 17 U.S.C. § 504(b); *Frank Music*, 772 F.2d at 514; *see also* Instruction No. 21 (docket no. 273). The jury's award, however, reflects an acceptance of some of Sears's evidence and arguments, but not all. Sears's gross revenue for the promotional period, November 19 - 23, 2005, was a little over $354.5 million. Of this amount, roughly $5.1 million was associated with the redemption of approximately 25,000 bounce back coupons, which had been distributed with infringing wishbones. The jury's calculation of $1,479,404 in indirect profits constitutes only about 29% of Sears's bounce-back-coupon gross revenue, whereas 42.7% of the coupons redeemed

ORDER 9–

were potentially attributable to the infringing wishbones.[3] If the jury had not taken into account deductible expenses and/or profit factors other than infringement, the jury could have awarded 42.7% of the $5.1 million in gross sales, and Sears could not be heard to complain because it bore the burden of proof on such matters.[4] Given the amount of the jury's award, the Court must conclude that the jury deducted some items of expense and/or elements of profit unrelated to infringement. The Court will not substitute its computations or otherwise disturb the jury's verdict, which is supported by substantial evidence and is not grossly excessive in light of the record in this case. Defendants' motion for judgment as a matter of law or remittitur as to the award of indirect profits is DENIED.

IT IS SO ORDERED.

The Clerk is directed to send a copy of this Order to all counsel of record.

DATED this 24th day of October, 2008.

_____
Thomas S. Zilly
United States District Judge

---

[3] The number of redeemed coupons arguably attributable to the wishbone giveaway is the amount over and above the normalized quantity of other coupons used for purchases during the same holiday period, which can be expressed as a percentage using the following formula: $(2.53 - 1.45) / 2.53 = 42.7\%$.

[4] The Court finds no merit in Sears's contention that the jury failed to consider (i) the 56% "incremental rate," which represents the percentage of consumers who would not have made a purchase but for the bounce back coupon; (ii) the 5.96% "profit to sales ratio," which reflects the amount of profit Sears generates on each sale; (iii) the expenses associated with the promotion at issue, including the cost of the infringing wishbones and the pro rata cost of advertising; and (iv) the factors other than infringement that might have contributed to a higher redemption rate, including the amount of the coupon ($10 off $100 purchase versus $5 off $50 purchase) and the timing of the promotion. Sears's proposition that the jury ignored one or more of these items is based on nothing more than speculation. For example, the jury could have applied the 56% incremental rate, which would have brought the $5.1 million in gross sales down to roughly $2.2 million, and deducted the promotional expenses of $217,908, and the result would still be over $500,000 more than the roughly $1.48 million the jury awarded. Moreover, the jury heard conflicting testimony concerning the incremental rate (56% versus 25%), the profit to sales ratio (5.96% versus 4.34%), and the pro rata cost of advertising ($47,772 versus $49,952). The jury could reasonably have concluded that Sears did not carry its burden of proof as to any one or more of the factors at issue.

ORDER 10–